STEPHEN R. HARRIS, ESQ.
Nevada Bar No. 001463
HARRIS LAW PRACTICE LLC
6151 Lakeside Drive, Suite 2100
Reno, NV 89511
Telephone: (775) 786-7600
E-Mail: steve@harrislawreno.com
Attorneys for Debtor

## UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF NEVADA

* * * * *

IN RE:                                          Case No. 12-51217
                                                (Chapter 11)

KINSLEY RESOURCES, INC.,
a Nevada corporation,
                                                Hearing Date: TBD
                                                Hearing Time: TBD
                Debtor.
_____/

## DEBTOR'S DISCLOSURE STATEMENT

Dated:              August 22, 2013

Filed by:           STEPHEN R. HARRIS, ESQ.
                    HARRIS LAW PRACTICE LLC
                    6151 Lakeside Drive, Suite 2100
                    Reno, Nevada 89511
                    Telephone: (775) 786-7600

                    Attorneys for KINSLEY RESOURCES, INC., a Nevada corporation

HARRIS LAW PRACTICE LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NV 89511
775 786 7600

# I. **INTRODUCTION**

KINSLEY RESOURCES, INC., a Nevada corporation, Debtor and Debtor-in-Possession ("Debtor" or "Kinsley") in the above-captioned Chapter 11 case, provides herewith the information contained in this DEBTOR'S DISCLOSURE STATEMENT ("DISCLOSURE STATEMENT") to all known creditors and other parties in interest of the Debtor in order to disclose that information deemed material, important, and necessary to the creditors to arrive at a reasonably informed decision in exercising their rights to vote for acceptance of the Plan of Reorganization.

Together with this DEBTOR'S DISCLOSURE STATEMENT, each creditor should also have received a copy of DEBTOR'S PLAN OF REORGANIZATION ("PLAN"), a form Ballot on which creditors and other parties in interest who are entitled to vote may cast their respective vote, and a copy of the ORDER APPROVING DEBTOR'S DISCLOSURE STATEMENT which indicates that the Bankruptcy Court has approved this DEBTOR'S DISCLOSURE STATEMENT for circulation to creditors in that it contains information of a kind and of sufficient detail, as far as its reasonably practicable, to enable creditors and other parties in interest to make an informed decision about the PLAN.  As indicated in the Instructions accompanying the Ballot, which is the form on which you may cast your vote to accept or reject the PLAN, the Ballot must be mailed to Debtor's counsel in time to insure that your Ballot will be received by the due date.  Ballots received after the due date may not be counted.

You are urged to carefully read this DEBTOR'S DISCLOSURE STATEMENT and the DEBTOR'S PLAN OF REORGANIZATION before deciding to accept or reject the PLAN. Particular attention should be directed to the provisions of the PLAN affecting your rights as well as the Liquidation Analysis which describes the results which would be obtained in the event the Debtor's business is discontinued and its assets liquidated.

## II. **THE CHAPTER 11 CONFIRMATION PROCESS**

The Chapter 11 confirmation process is governed, in large part, by the Bankruptcy Code. Under the Bankruptcy Code, to be confirmed, the DEBTOR'S PLAN OF REORGANIZATION must be accepted by at least one Class of Creditors whose claims against the Debtor will be

1   "impaired" under the PLAN.  Claimants who are scheduled to receive full payment on their

2   Claims are deemed to have accepted the PLAN and do not vote.  Only Creditors whose Claims

3   are "impaired" are entitled to vote in favor of accepting or rejecting the PLAN.  A Class of

4   claims is "impaired" if the amount to be paid to the Class provides the Claimants in that Class

5   with less than full payment of the Allowed Claims in that Class or the terms for repayment are

6   extended beyond the contractual due date.  Acceptance by such Class requires that at least one-

7   half of the Creditors in the Class who cast accepting votes on the PLAN, and hold at least two-

8   thirds of the total dollar amount of the Claims in that Class casting votes on the PLAN.

9                                    **III. DISCLAIMER**

10  **NO REPRESENTATIONS CONCERNING THE DEBTOR, ITS FUTURE BUSINESS**

11  **OPERATIONS OR VALUE OF PROPERTY, ARE AUTHORIZED BY THE DEBTOR,**

12  **OTHER THAN AS SET FORTH IN THIS STATEMENT.  ANY REPRESENTATIONS**

13  **OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN OF**

14  **REORGANIZATION WHICH ARE NOT CONTAINED HEREIN OR IN THE PLAN**

15  **OF REORGANIZATION SHOULD NOT BE RELIED ON BY ANY CREDITOR OR**

16  **OTHER PARTY IN INTEREST.  ALTHOUGH THE FINANCIAL INFORMATION**

17  **CONTAINED HEREIN IS BELIEVED TO BE ACCURATE, IT HAS NOT BEEN**

18  **SUBJECTED TO ANY CERTIFIED AUDIT AND IS NOT WARRANTED OR**

19  **REPRESENTED TO BE ERROR FREE.**

20             **IV. DEBTOR'S FINANCIAL HISTORY AND EVENTS LEADING TO**

21                                **CHAPTER 11 FILING**

22              KINSLEY RESOURCES, INC., a Nevada corporation, was officially formed on May

23  15, 2007, in order to be a single asset entity for the project at Kinsley Mountain.  Debtor is

24  a Nevada "S" Corporation in good standing.  There are 10,000 shares of stock authorized with

25  5,151 shares issued. 1,580 shares are owned by Howard C. Anderson (now deceased and the

26  shares held by Linda Schuette, Chapter 7 Panel Trustee in the estate of Howard (deceased) and

27  Mary Anderson's personal Bankruptcy Case No: 11-11072-AJ in United States Bankruptcy

28  Court Northern District of California), with said shares to be acquired by Bruce Anderson,

Fletcher Anderson, Susan Monasterio and Daphne Cann, (Howard and Mary's children); 1,580 shares issued to Bruce Anderson; 1,580 shares issued to Fletcher Anderson; 258 shares are owned by Neal Marlett; 102 shares issued to Kevin Donahue; and 51 shares issued to Richard McMillan. The legal/operating business addresses is:

237 Kensington Park, Contact: Bruce C. Anderson, President

Irvine, CA 92606, Tel: 206.605.0208   Fax: 949.857.0217

Approximately a year and a half after purchasing the Kinsley claims in July 2007, the U.S. economy went into a severe economic recession for a number of years and is just now showing some signs of recovery. This caused several of Debtor's potential buyers to lose their funding and the sales fell through.

Due to an extremely large debt load and the disputes between the secured creditors, several additional buyers were forced to withdraw their bids for Debtor shares and assets. This caused the Debtor to fall behind on its payments to its secured creditors and to seek additional financing to maintain the property, stake claims, file annual BLM claim maintenance fees and annual County Notices of Intent to Hold fees, fight the legal battles and to begin to market the project to a whole new group of investors. This has caused Debtor many delays and significant cost and hardship in maintaining the project.

There was a dispute between the Debtor and Fourth & One, LLC ("FOURTH"), as detailed below regarding Debtor's right to convert FOURTH's Promissory Note and Deed of Trust into an equity position with Debtor. FOURTH chose to ignore the conversion agreement and filed a foreclosure on its security interest which Debtor tried to stop until a settlement was reached.

Nevada Industrial Minerals ("NIM") has a subordinated position with a Promissory Note secured by a Second Deed of Trust on the same mining claims as FOURTH who has the first Trust Deed position. When FOURTH filed to foreclose, NIM filed an Involuntary Bankruptcy against Debtor. Prior to the Involuntary Bankruptcy, Debtor and NIM had a conversion to equity agreement that NIM chose to ignore. A settlement was reached for a reduction of the overall debt between NIM and Debtor.

Additionally, the mining claims are not currently in production, and even under normal selling conditions, the buyer pool is limited to those who are seeking a "miner's deal", which generally puts most of the buyer's investment into physical development of the property and therefore results in very little if any funding for the property itself.  The requirement to pay off the secured creditors under the legal entanglements has caused many potential buyers to back off from this project.

On July 3, 2007 Debtor entered into three written agreements with FOURTH.    Under the terms of these three agreements, Debtor borrowed from FOURTH the sum of Three million dollars in exchange for a Promissory Note which was secured by a Deed of and a Beneficiary Capital Contribution and Investment Participation Agreement (term Sheet).

Under the terms of the Promissory Note, Debtor agreed to repay the loan, principal and interest, on or before June 26, 2008, and the Note provided that Debtor had an option to extend the term of the note an additional six months.  The Term Sheet provides "... In the event that an immediate sale of the project to Dajobar Community Investment, LLC (listed in the letter of intent) does not occur, the cash investors will receive a pro-rated share of 10% of the pre-tax profits of the Debtor related to this project.  The note shall be deemed paid in full and the Deed of Trust reconveyed through the issuance of shares equaling 10% equity in Kinsley Resources, Inc., shall be issued pro-rata to each investor ...".  A sale to Dajobar Community Investment, LLC never occurred.

In June, 2008 Debtor sought to exercise its option to extend the Note, and was informed by FOURTH that it was agreeable to such extension and would calculate the interest and fees for the extension and would provide that number to Debtor.  Between June 2008 and March 18, 2009 Debtor continued to request the sum necessary to exercise its option to extend and was advised by Fourth that when the sum was calculated Debtor could pay the sum and extend the term of the Note.

On March 18, 2009 FOURTH caused to be record in the offices of the White Pine County Recorder's Office and the Elko County Recorder's Office a Notice of Breach and Election to Cause Sale, and a Trustee's Sale Notice.

On June 3, 2009, Debtor filed an action against FOURTH in the Orange County Superior Court for breach of contract and declaratory relief as case number 30-2009-00123993. On June 21, 2009, Debtor filed an action in Elko County, Nevada as case number CV-C-09-639 for the purpose of obtaining a Temporary Protective Order, a Preliminary and Permanent Injunction to prevent the sale of Debtor's property prior to the determination of the Orange County Superior Court action.     The Court issued a Temporary Protective Order against FOURTH, which was in effect, restraining the sale of Debtor's property.  FOURTH removed the Nevada State Court action to the Federal Court, case number CV-004435-BNES-RAM where the issue of a Preliminary Injunction was heard on October 16, 2009 after several court delays.  A Temporary Injunction was granted for 60 days.   On June 1, 2009, pursuant to the provisions of the Term Sheet, a meeting of the Board of Directors of Debtor was held and corporate Resolution to convert the FOURTH Promissory Note and Deed of Trust into a 10% equity interest in Debtor was passed.  Bruce Anderson hand delivered a copy of the Resolution with a cover letter to FOURTH, a true and correct copy of said resolution and cover letter.

In Superior Court of the State of California The County of Orange Case No. 30-2009-00123993 on May 31, 2013 a Stipulation was entered between Debtor and FOURTH and members of Fourth, Terrell Davis, Lamar Davis, Classic Advantage Investments, LLC, Value Funding Group, Inc., Giovanni D' Amore, Lance Baral, James Shunk, William Kotlar, John Fuller, Western Energy Partners, LLC, Temple Hills Development, LLC., Wave Wealth Management, LLC, and Cross-Debtor Bruce C. Anderson, as follows:

> The litigation between Debtor, Bruce C. Anderson and FOURTH and its members, shall be dismissed with prejudice.  The settlement also included all claims by Value Funding, Ashton Gowadia and Frank White arising under those certain commission agreements between the parties hereto.  Debtor agreed not to file bankruptcy or otherwise interfere with the existing foreclosure and/or a judicial foreclosure should FOURTH deem it necessary and instead agreed to cooperate with any and all foreclosure efforts by Fourth & One, judicial or non-judicial, necessary for FOURTH to acquire the patented and un-patented mining claims as its security interest.  In

exchange for certain considerations, and the other promises and representations set forth in this Stipulation, FOURTH granted Debtor an unconditional 120 day Option from the date of final foreclosure sale to allow Kinsley to purchase the mining claim security interest back from FOURTH for the sum of Ten Million dollars, $10,000,000, paid during the 120 day option period by depositing such sum into an escrow opened at Stewart Title in Elko, Nevada, by the parties hereto and Fourth & One agrees upon such deposit to execute a full reconveyance of all its interest in the mining claims.  NIM filed the Involuntary Bankruptcy against Debtor prior to the FOURTH and Debtor Stipulation being implemented.  FOURTH was not able to complete its foreclosure and the 120 day Option period for Debtor to buy back the security interest has therefore not begun.  In the interim, FOURTH has stated that they are willing to settle for $4,500,000 either in or out of the Debtor's Chapter 11.

Debtor has performed according to the terms of the written agreements with FOURTH, but FOURTH, should the Relief of Stay be granted, would be in a position to conduct a Trustees Sale and if that sale occurs before this Court can determine the rights of the parties under this Plan, Debtor's investments, and the unsecured creditors' investments and the Debtor shareholder investments will be forever lost while the secured creditors security interests would be significantly devalued.

Kinsley's holdings include several large scale mineral resources including what is considered to be a very large "world class" deposit of superior marble, which is easy to quarry. This property located on BLM land claimed under the Mining Law of 1872 is accessible and developable.  As an inducement for Debtor to buy the 60 claims from NIM, NIM provided its Executive Summary Valuation Report to Kinsley prior to Kinsley closing escrow with NIM on the 60 claims, titled "The Four Huge Profit Opportunities for Kinsley Marble and Gold Mountain,".  NIM valued the 60 claims at $172,080,000,000.

On December 1, 2006 and July 13, 2007, Debtor entered into two written agreements with NIM whereby for the purchase price of Six-Million dollars, Debtor purchased those certain mining claims located in the State of Nevada as described above, by paying Two-Million

1   Dollars in cash and securing the balance of Four Million Dollars by a Promissory Note which
2   was secured by a Promissory Note secured by a second Deed of Trust subordinate to
3   FOURTH's first trust deed.

4          In March 2009, Debtor and NIM entered into an oral agreement whereby it was agreed
5   between them that the terms of the December 1, 2007 Purchase Agreement and the July 18,
6   2007 Promissory Note and Deeds of Trusts would be modified.    On March 3, 2009 NIM's
7   attorney completed the written Modification Agreement which set forth the terms the 2009 Oral
8   Agreement.   On March 9, 2009 Debtor's President signed the Modification Agreement and
9   returned the signed document to NIM and requested that NIM's President Warren Herr sign its
10  copy and return the subscribed copy to Debtor.

11         Under the terms of the 2009 Modification Agreement, NIM agreed to modify its July 18,
12  2007 Promissory Note by reducing the principal to Five Hundred Thousand dollars, at 8%
13  simple interest, with monthly payments of Three-thousand, Three-hundred and Thirty-three and
14  33/100 dollars per month with the first such payment to be due and payable on March 1, 2009
15  and continue through July 18, 2010 when the balance would be due and payable.   In exchange
16  for the modification of the Promissory Note, Debtor agreed to issue to NIM an option to acquire
17  a one percent of the issued and outstanding shares of Debtor and to pay to the sum of Five
18  Hundred Thousand Dollars no later than April 1, 2009 or issue to NIM an additional option to
19  acquire an additional one percent of the issued and outstanding shares of Debtor.

20         Between February 2009 and August 2009, Debtor made all payments required of it
21  under the terms of the 2009 Modification Agreement, and continued to request that NIM
22  provide Debtor with a subscribed copy of the 2009 Modification Agreement.   In August 2009,
23  NIM, through its Managing Member Warren Herr, repudiated the 2009 Modification
24  Agreement.

25         On or about November 18, 2010, NIM caused a Notice of Breach and Election to Cause
26  Sale to be recorded in the offices of the White Pine and the Elko County Recorder's Offices.
27  On February 25, 2011 NIM, caused a Notice of Sale to be recorded in the offices of the White
28  Pine and the Elko County Recorder's Offices, a Notice of Trustee's Sale wherein NIM

1    demanded payment of the sum of $4,000,000.00, which was not supported by the written

2    agreements or the by the subsequent 2009 agreements between Debtor and NIM.

3        A dispute arose between Debtor and NIM concerning NIM's claim to $4,000,000.00 and

4    absent this Court's intervention, Debtor's property would be sold at a Trustee's Sale on March

5    21, 2011 and the property would have been lost.  NIM's second deed of trust is subordinate to a

6    first deed of trust in favor of Fourth.

7        Whereas, both Kinsley and NIM were parties to two separate pre-petition state court

8    cases commenced in the Second Judicial District Court in and for Washoe County, Nevada:

9    Kinsley v. NIM, CV11-01849; and NIM v. Kinsley, CV 11-01685.  A Stipulated Settlement was

10   reached on August 20, 2013 that stated: Kinsley shall pay $365,293.65 (Three Hundred Sixty

11   Five Thousand Two Hundred Ninety Three and 65/100) to resolve all claims of NIM, Herr,

12   Arbar and Quantum against Kinsley and Anderson, including the Howard C. Anderson probate

13   estate, which amount includes $15,293.65 (Fifteen Thousand Two Hundred Ninety Three and

14   65/100) in attorney's fees and costs for NIM for its counsel, White Law Chartered.  However,

15   before the payment agreed to in the Stipulation could be executed, FOURTH pushed through its

16   foreclosure sale and NIM was forced to file an Involuntary Bankruptcy against Debtor to protect

17   its security interest position.

18       As a direct and proximate result of the NIM's breach of the agreements, Debtor has been

19   required to retain legal counsel and incurred expenses, including, without limitation reasonable

20   attorney's fees and costs.  These legal actions have further delayed funding with our potential

21   equity investors until the bankruptcy could be resolved.  Debtor has suffered damages in a sum

22   which are presently unknown but which could be quite large due to the delay in funding.

23   Kinsley, NIM, Arbar, and Quantum were to execute a Stipulation to Dismiss Involuntary Case,

24   providing for the dismissal of the involuntary petition with Kinsley and Arbar to pay their own

25   fees and costs and with an acknowledgment that Kinsley has paid NIM's attorney's fees and

26   costs.  NIM was to execute a Reconveyance of Deed of Trust to be held pending the entry of an

27   Order Dismissing Involuntary Case, which may be recorded immediately upon entry of that

28   Order.  This summarizes the Stipulation.

Due to the conflict of FOURTH's foreclosure and NIM needing to protect its security interest, NIM refused to dismiss the Debtor's Involuntary Bankruptcy and the case was converted to a Chapter 11 proceeding on April 24, 2013.

## V. DESCRIPTION AND VALUATION OF ASSETS

The Debtor's assets which existed on the Petition Date are described as follows:

| Description | Est. Resource Value | Est. Liquidation Value |
|---|---|---|
| 232 lode mining claims | $94,467,617.00 | $16,000,000.00 |
| 4 Patented claims | $    632,541.00 | $      50,000.00 |
| One well w/610 AFA water | $ 3,682,000.00 | $    362,820.00 |
| Water Permit w/550 AFA water | $ 3,300,000.00 | $    330,000.00 |
| Water Permit w/550 AFA water | $ 3,300,000.00 | $    330,000.00 |
| Water Permit w/165 AFA water | $ 1,000,000.00 | $    100,000.00 |
| | $106,382,158.00 | $17,172,820.00 |

There is a distinction between the geologists estimates of the in ground resources using only historical gold production records and drilling records from previous owners/operators versus the "market" liquidation value. The marble portion of the property has been drilled and there is a huge quantity of proven marble reserves. There are extensive historical gold mining records for previous production on the mountain including some drill reports. Please see Pilot Gold's website for the most recent results at Kinsley Mountain. There are also examples of companies that have sold for large amounts for speculation on in ground resources such as the Fronteer to Newmont sale in May of 2011. However, the typical "miners" deal is for a mining development company to make forward commitments for exploration and drilling to an agreed upon amount and usually with most of the dollars generally going into the physical development of the property therefore resulting in little or no funding for the property owner itself. The buyer/development company usually takes 70-90% of the deal and usually 3-10 years to "prove up" the resources by completing an NI43-101 Report and full Feasibility Study. Further, due to delays in funding caused by the past and current legal action, Debtor's footprint has been reduced to the assets listed above.

HARRIS LAW PRACTICE LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NV 89511
775 786 7600

## VI. SIGNIFICANT POST-PETITION EVENTS

The following significant events have occurred post-petition: The water rights which were beneficial use permits were extended to Debtor until April and May of 2014.

## VII. ADMINISTRATIVE AND UNCLASSIFIED CLAIMS

**ADMINISTRATIVE CLAIMS:** All costs and expenses of administration in this case, including any actual and necessary expenses of preserving or liquidating the assets of the Debtor's estate, all allowances, including professional fees and costs, approved by the Court, and any other costs and expenses entitled to priority pursuant to 11 U.S.C. § 507(a)(1) of the Bankruptcy Code and 28 U.S.C. § 1930, shall be paid in full on or before the Effective Date of the Plan. The holders of these claims include the attorneys and accountants for the Debtor, unpaid post-petition accounts payable (if any), and all fees to be paid to the Office of the United States Trustee. The estimated administrative expenses for the Debtor's reorganization proceeding are from $50,000.00 up to $100,000.00, and consist of:

$0.00    Trustees fees that are owed the U.S. Trustee's Office for the applicable quarters of 2013 prior to plan confirmation [payment is anticipated to be made when due];

$100,000.00    Estimated professional fees for the Debtor's general bankruptcy attorney, Stephen R. Harris, Esq., of HARRIS LAW PRACTICE LLC, calculated as of the date of confirmation (estimated at $100,000.00 for a contested confirmation and hearing and $50,000.00 for an uncontested confirmation hearing);

$0.00    Post-petition accounts payable with [all post-petition administrative expenses are expected to be paid in full in the normal course of business prior to confirmation].

Professional fees, both legal and accounting, shall continue to accrue up through and subsequent to the Confirmation Date, with final amounts owing subject to Court approval.

UNCLASSIFIED PRIORITY TAX CLAIMS:

1. **Description**. The Debtor's priority tax claims are as follows:

| Name | Scheduled Amount | Proof of Claim Amount | Allowed Priority Amount |
|---|---|---|---|
| None known at this time | | | |
| **Total:** | | | |

1    Pursuant to the Debtor's Plan, the treatment and disposition of the unclassified priority tax
2    claims, if any, will be as follows: Any claim discrepancy will be resolved by the claim objection
3    process, with the stipulated amount and/or Court decreed amount owing used to calculate that
4    particular creditors' allowed claim being paid by the Debtor.    All unclassified priority tax
5    creditors, if any, shall be paid 100% of their allowed claim amount, with statutory interest
6    thereon, over a five (5) year time period commencing on the Effective Date of the Plan.  The
7    payments shall be made quarterly, equally amortized over sixty (60) months, with statutory
8    interest accrued thereon, but without any penalties.  In the event the Debtor fails to make the
9    payments as set forth hereinabove, the allowed priority tax creditors, if any, shall have the right
10   to proceed with any administrative remedies available to them, fifteen (15) days after written
11   notice of default has been given to the Debtor and their attorney, Stephen R. Harris, Esq.

12                                **ARTICLE VIII.**

13                  **CLASSIFICATION OF CLAIMS AND INTERESTS**

14          Pursuant to Section 1122 of the Bankruptcy Code, claims against the estate have been
15   divided into the following classifications for purposes of administration and voting on the Plan:

16          1.    **CLASS   SECURED CLAIM [FOURTH & ONE LLC]:**  This Class consists of
17   the secured claim of FOURTH & ONE LLC ("FOURTH"), in the approximate unpaid principal
18   and accrued interest sum of $4,062,903.00, plus accruing interest at the contractual rate of 5%,
19   calculated as of the Petition Date.  The Class 1 claim of FOURTH is secured by a first priority
20   deed of trust recorded against the real property consisting of 44 Lord & Son unpatented mining
21   claims, 54 King unpatented mining claims in Elko and White Pine Counties, Nevada and 4
22   patented mining claims in White Pine County, Nevada,  ("Kinsley Mining Claims").

23          2.   **CLASS 2 SECURED CLAIM [NEVADA INDUSTRIAL MINERALS]:**  This
24   Class consists of the secured claim of NEVADA INDUSTRIAL MINERALS ("NIM"), in the
25   negotiated settlement amount of $385,000.00, plus accruing interest at the contractual rate,
26   calculated as of the Petition Date.  The Class 2 claim of NIM is secured by a second priority
27   deed of trust recorded against the real property consisting of 54 King unpatented mining claims
28   in Elko and White Pine Counties, Nevada and 4 patented mining claims in White Pine County,

Nevada, ("Kinsley Mining Claims").  This Second Deed of Trust is subordinate to FOURTH.

3.  **CLASS 3 SECURED CLAIM [CRAIG BRADFORD]**: This Class consists of the secured claim of CRAIG BRADFORD ("BRADFORD"), in the approximate unpaid principal and accrued interest sum of $393,231.08, plus accruing interest at the contractual rate calculated as of the Petition Date.  The Class 3 claim of BRADFORD is secured by a first priority deed of trust recorded against the real property consisting of 10 Lord & Son unpatented mining claims and 3 additional unrecorded Lord & Son unpatented mining claims in Elko County and additional collateral in the form of a second position unrecorded interest in the water well known as water right Permit# 52895 in Elko County, Nevada.  KINSLEY disputes the amounts on the Proofs of Claim filed in this case by BRADFORD on June 3, 2013 and June 10, 2013, as Claims No. 1-1, and 2-1, respectively.

4.  **CLASS 4 SECURED CLAIM [BILL BENDAU LAND SERVICES]**: This Class consists of the secured claim of BILL BENDAU LAND SERVICES ("BENDAU"), in the approximate unpaid principal and accrued interest sum of $194,000.00, plus accruing interest at the contractual rate calculated as of the Petition Date.  The Class 4 claim of BENDAU is secured by a first priority deed of trust recorded against the real property consisting of 1 Lord & Son unpatented mining claim in Elko County and a first priority deed of trust against the water right Permit# 80591 in Elko County, Nevada.

5.  **CLASS 5 SECURED CLAIM OF [EUCON CORP & DEATLEY CRUSHING]**: This Class consists of the secured claim of EUCON CORP & DEATLEY CRUSHING ("DEATLEY"), in the approximate unpaid principal and accrued interest sum of $300,000.00, plus accruing interest at the contractual rate calculated as of the Petition Date.  The Class 5 claim of DEATLEY is secured by a first priority deed of trust recorded against the real property consisting of 6 Lord & Son unpatented mining claims in Elko County.

6.  **CLASS 6 SECURED CLAIM OF [LDP DIVERSIFIED LLC]**: This Class consists of the secured claim of LDP DIVERSIFIED LLC ("LDP"), in the approximate unpaid principal and accrued interest sum of $200,000.00, plus accruing interest at the contractual rate calculated as of the Petition Date.  The Class 6 claim of LDP is secured by a first priority deed

of trust recorded against the real property consisting of water well and water appropriation rights known as water right Permit# 52895 in Elko County, Nevada.

7. **CLASS 7 SECURED CLAIM OF [TERRY VANCE]:** This Class consists of the secured claim of TERRY VANCE ("VANCE"), in the approximate unpaid principal and accrued interest sum of $155,088.04, plus accruing interest at the contractual rate calculated as of the Petition Date. The Class 7 Claim of VANCE is secured by a first priority deed of trust recorded against the real property consisting of 5 Lord & Son unpatented mining claims in Elko County. KINSLEY disputes the claim amount in the Proof of Claim filed by VANCE in this case on June 24, 2013, as Claim No. 3-1.

8. **CLASS 8 SECURED CLAIM OF [BILL DEGAR]:** This Class consists of the secured claim of BILL DEGAR ("DEGAR"), in the approximate unpaid principal and accrued interest sum of $90,000.00, plus accruing interest at the contractual rate calculated as of the Petition Date. The Class 8 claim of DEGAR is secured by a first priority deed of trust recorded against the real property consisting of 1 Lord & Son unpatented mining claim in Elko County.

9. **CLASS 9 CLAIMS [GENERAL UNSECURED ALLOWED CREDITORS]:** This Class consists of all allowed unsecured claims against the Debtor and disputed claims to the extent disputed claims may be proven and allowed by the Court. The Class 9 Unsecured Claims total approximately $6,924,433.43, are detailed as follows:

| Creditor Claims: | Scheduled Amount | Proof of Claim Amount | Allowed Amount |
|---|---|---|---|
| Allison, MacKenzie, Pavlakis | $3,000.00 | | $3,000.00 |
| Anderson, Bruce (insider) | $1,065,000.00 | | $1,065,000.00 |
| Anderson, Fletcher (insider) | $700,000.00 | | $700,000.00 |
| Anderson, R.O. | $18,032.42 | | $18,677.87 |
| Arbar, Edwin | $75,000.00 | | $75,000.00 |
| Bank of America | $30,831.81 | | $30,831.81 |
| Barriga, Delia | $50,000.00 | | $50,000.00 |

| | | | |
|---|---|---|---|
| Bethel Baptist Church | $75,000.00 | | $75,000.00 |
| Bracamontes, Alex | $5,000.00 | | $5,000.00 |
| Bracamontes, Salvador | $4,500.00 | | $4,500.00 |
| Brakebush, Steve | $200,000.00 | | $200,000.00 |
| Brewer, Eric | $15,000.00 | | $15,000.00 |
| Bullock, Bruce | $200,000.00 | | $200,000.00 |
| Cann, Brian | $2,000.00 | | $2,000.00 |
| Carruthers, Laura D. | $10,000.00 | | $10,000.00 |
| Castro, Adelaido | $50,000.00 | | $50,000.00 |
| Castro, Jose | $25,000.00 | | $25,000.00 |
| Chamberlain, Allen | $180,000.00 | | $180,000.00 |
| Christian, Greg | $104,500.00 | | $104,500.00 |
| Cibrian, Vanessa | $3,000.00 | | $3,000.00 |
| Cifuentes, Ana Patricia | $5,000.00 | | $5,000.00 |
| Danforth, William | $50,000.00 | | $50,000.00 |
| Davis, Richard B. (Company) | $0.00 | | $11,000.00 |
| DeSantiago, Joel | $10,000.00 | | $10,000.00 |
| DeSantiago, Mario | $150,000.00 | | $150,000.00 |
| DeRoo, Paul | $15,000.00 | | $15,000.00 |
| Donahue, Kevin (investment) | $320,000.00 | | $320,000.00 |
| Donahue, Kevin (goods & services) | $56,540.00 | | $56,540.00 |
| Erickson, Joe | $30,000.00 | | $30,000.00 |
| Estate of Howard Anderson (investor) | $435,000.00 | | $435,000.00 |
| Estate of Howard Anderson (fees) | $580,000.00 | | $580,000.00 |
| Estate of Warren Herr | $50,000.00 | | $50,000.00 |
| Falcon Geodetic, LTD. | $22,000.00 | | $22,000.00 |
| Figueroa, Otto | $1,000.00 | | $1,000.00 |

| | | | |
|---|---|---|---|
| Finkelstein, Mark | $60,000.00 | | $60,000.00 |
| Garcia, Ricardo | $25,000.00 | | $25,000.00 |
| Gonsalez, Peter | $7,000.00 | | $7,000.00 |
| Gudiel, Bertha | $21,000.00 | | $21,000.00 |
| Gudiel, Luis | $70,000.00 | | $70,000.00 |
| Gutierrez, Liza | $3,000.00 | | $3,000.00 |
| Haro, Jacqueline | $25,000.00 | | $25,000.00 |
| Harris, Richard (admin. Special counsel) | $5,000.00 | | $5,000.00 |
| Hayter, Ken | $25,000.00 | | $25,000.00 |
| Hillis, Steve & Paula | $80,000.00 | | $80,000.00 |
| Inzuza, Gavino Rivera | $100,000.00 | | $100,000.00 |
| Leon, Antonio | $5,000.00 | | $5,000.00 |
| Lopez, Robert | $142,000.00 | | $142,000.00 |
| Lyman, Greg | $50,000.00 | | $50,000.00 |
| Marinovich, Steve | $44,800.00 | | $44,800.00 |
| Marlett, D. Neal | $922,531.00 | | $922,531.00 |
| McMillan, Richard | $80,000.00 | | $80,000.00 |
| Miramontes, Jose A. | $5,000.00 | | $5,000.00 |
| Miramontes, Leobardo | $50,000.00 | | $50,000.00 |
| Moskowitz, Erik | $50,000.00 | | $50,000.00 |
| Myers, Lynda | $25,000.00 | | $25,000.00 |
| Nolan, Ken | $15,000.00 | $15,000.00 | $15,000.00 |
| Nolan, James R. "Skip" | $53,000.00 | $53,000.00 | $53,000.00 |
| Ocampo, Clemente | $0.00 | | $10,000.00 |
| Paredes, Jose & Irene | $55,000.00 | | $55,000.00 |
| Penunuri, Isela V. | $15,000.00 | | $15,000.00 |
| Pimentel, Maria D. | $13,000.00 | | $13,000.00 |

| Pimentel, Milton | $6,000.00 | | $6,000.00 |
|---|---|---|---|
| Pimentel, Pasqual & Leticia | $10,000.00 | | $10,000.00 |
| Rardin, Bob & Melinda | $60,000.00 | | $60,000.00 |
| Sanchez, Gabriel & Paulina | $10,000.00 | | $10,000.00 |
| Sanchez, William & Darlene | $30,000.00 | | $30,000.00 |
| Seffens, Steve | $5,000.00 | | $5,000.00 |
| Sun, Fernando | $2,000.00 | | $2,000.00 |
| Tapia, Martha V. | $2,000.00 | | $2,000.00 |
| Valdez, Francisco | $10,000.00 | | $10,000.00 |
| Villa, Juan | $15,000.00 | | $15,000.00 |
| Walsh, Baker et.al. | $3,423.25 | | $3,423.25 |
| Westbrook, Bobby | $256,630.00 | $252,630.00 | $252,630.00 |
| Worthington, Mike & Debi | $10,000.00 | | $10,000.00 |
| Total | $6,906,788.48 | | $6,924,433.93 |

10. **CLASS 10 CLAIMS [EQUITY INTERESTS ]:** This Class consists of the equity interests of the shareholders of the Debtor that existed on the Petition Date. Specifically, Bruce C. Anderson owning 1,580 shares, estate of Howard C. Anderson owning 1,580 shares, Fletcher H. Anderson owning 1,580 shares, Neal Marlett owning 258 shares, Kevin Donahue owning 102 shares, and Richard McMillan owning 51 shares.

## ARTICLE IX.

## TREATMENT OF CLASSES

1. **CLASS 1 SECURED CLAIM [FOURTH & ONE LLC]:** The Class 1 Secured Claim of FOURTH shall retain its existing security interest and the outstanding loan balance shall be recalculated using the outstanding principal balance plus accrued interest at the non-default rate of interest of 5% from the date of the Notice of Default, plus reasonable attorneys' fees and collection costs (no late fees are to be included) until the Confirmation Date ("Modified Loan Balance"). The security interest of FOURTH consists of 4 patented fee simple

mining claims and 98 mining lode claims located on Bureau of Land Management land. Annual maintenance fees on the 98 lode claims are due to the BLM by August 31, 2013 in the amount of $13,720.00. Pursuant to the STIPULATION BETWEEN DEBTOR AND FOURTH & ONE RE: TERMINATION OF AUTOMATIC STAY [Docket No. 70] ("Stipulation"), entered into between the Debtor and FOURTH, Debtor shall pay the annual BLM claim maintenance fees in the approximate amount of $13,580.00 on or before August 27, 2013, as well as fees due to Elko County and White Pine County (collectively "Counties") in the amount of $970.00 on or before October 24, 2013, and provide proof of such payment to FOURTH by 11:59 p.m. on August 27, 2013, and October 24, 2013, respectively.    If Debtor fails to timely make the required payments to the BLM and Counties, and provide proof of such payment(s) to FOURTH, then the automatic stay shall be terminated immediately to allow FOURTH to pursue its legal and contractual remedies against its collateral. If the Debtor makes the required payments to the BLM and Nevada counties as agreed upon in the Stipulation, then the Modified Loan Balance shall be paid in full on or before December 2, 2013, unless such deadline is extended upon mutual written agreement of the parties.    Upon receiving payment of the Modified Loan Balance, FOURTH shall release its interest in the collateral and file a reconveyance deed in favor of the Debtor in the counties where the security is located. If the Debtor does not pay FOURTH its Modified Loan Balance in full by December 2, 2013, then the 11 U.S.C. §362(a) automatic stay shall terminate immediately thereafter, allowing FOURTH to enforce its legal and contractual remedies against the collateral.    Accordingly, the Class 1 secured claim of FOURTH is _impaired_ under the PLAN.

2. **CLASS 2 SECURED CLAIM [NEVADA INDUSTRIAL MINERALS]**: The Class 2 Secured Claim of NIM shall retain its existing security interest and the outstanding settlement balance of $385,000.00 shall be recalculated using the outstanding settlement balance plus accrued interest at the non-default rate of interest of 8% from the date of the Notice of Default, plus reasonable attorneys' fees and collection costs (no late fees are to be included) until the Confirmation Date ("Modified Loan Balance").    NIM's security interest is in a subordinated second position behind FOURTH on 54 of the unpatented lode mining claims

above and on the 4 patented fee simple mining claims. Should FOURTH be granted relief from stay and complete its foreclosure, NIM would lose its security interest. The Class 2 secured claim of NIM shall be paid as follows: The Modified Loan Balance shall be paid in full within 90 days of the Effective Date, assuming the Debtor is able to pay the annual BLM claim maintenance fees on the 98 claims. Upon receiving payment of the Modified Loan Balance, NIM shall cause to be recorded a reconveyance deed in the favor of Debtor in the counties where the security interest is located. In the event the Debtor is not able to pay the BLM claim maintenance fees in a timely manner, then FOURTH will foreclose on its collateral which will wipe out NIM's security interest, and in that case, NIM shall be paid in the same manner as the Class 9 General Unsecured Claims. Accordingly, the Class 2 secured claim of NIM is impaired under the PLAN.

3. **CLASS 3 SECURED CLAIM [CRAIG BRADFORD]:** The Class 3 Secured Claim of BRADFORD shall retain its existing security interest and the outstanding loan balance shall be recalculated using the outstanding loan balance plus accrued interest at the non-default rate of interest of 1% from the date of the Notice of Default, plus reasonable attorneys' fees and collection costs (no late fees are to be included) until the Confirmation Date ("Modified Loan Balance"). BRADFORD's security interest of 10 unpatented lode mining claims on BLM land is secured by a recorded First Deed of Trust. In addition, BRADFORD has a first position on 3 unpatented lode mining claims with no recorded trust deed and a second unrecorded position on Water Well Permit #52895 and well. BRADFORD's Class 3 allowed claim shall be paid pursuant to a STIPULATION BETWEEN DEBTOR, TERRY L. VANCE, JR. AND CRAIG BRADFORD RE: TERMINATION OF AUTOMATIC STAY ("Stipulation") entered into between the parties, as follows:

a. Debtor shall pay the annual claim maintenance fees to the BLM and Elko County in the approximate amount of $1,820.00 in a timely manner with proof of such payment to be provided to BRADFORD. Additionally, Debtor shall pay BRADFORD its Modified Loan Balance in full by December 2, 2013. Upon receiving payment in full of the Modified Loan Balance, BRADFORD shall release its interest in the

1    collateral and file a reconveyance deed in favor of the Debtor in Elko County where
2    the security interest is located.

3    b. If Debtor is unable to pay the annual BLM and Elko County fees by the due dates
4    and provide evidence to BRADFORD pursuant to the parties Stipulation, then the 11
5    U.S.C. §362(a) automatic stay shall be terminated immediately, and BRADFORD
6    would be entitled to enforce its legal and contractual remedies against its collateral.
7    In that event, BRADFORD shall pay the BLM claim maintenance fees in the amount
8    of $1,820.00 in a timely manner with proof of such payment to be provided to
9    Debtor, and Debtor shall have an option to repurchase the collateral within 120 days
10    from the date of any foreclosure by BRADFORD by paying the Modified Loan
11    Balance in full.

12    Accordingly, the Class 3 security interest claim of BRADFORD is impaired under the PLAN.

13    **4. CLASS 4 SECURED CLAIM [BILL BENDAU LAND SERVICES]:**  The Class 4
14    Secured Claim of BENDAU shall retain its existing security interest and the outstanding loan
15    balance shall be recalculated using the outstanding loan balance plus accrued interest at the non-
16    default rate of interest of 11% from the date of the Notice of Default, plus reasonable attorneys'
17    fees and collection costs (no late fees are to be included)  until the Confirmation Date
18    ("Modified Loan Balance").  BENDAU's security interest of 1 unpatented lode mining claim on
19    BLM land and Water Rights Permit # 80591 is secured by a recorded First Deed of Trust.  The
20    Class 4 secured claim of BENDAU shall be paid as follows:

21    a. Debtor shall pay the annual BLM claim maintenance fees in the amount of $140.00
22    on or before five (5) days prior to the deadline for payment of those fees, with proof
23    of such payment to be provided to BENDAU.  Additionally, Debtor shall pay
24    BENDAU its Modified Loan Balance in full within ninety (90) days from the
25    Effective Date of the Plan.  Upon receiving payment of the Modified Loan Balance,
26    BENDAU shall release its interest in the collateral and file a reconveyance deed in
27    favor of the Debtor in Elko County where the security interest is located.

28    b. If the Debtor is unable to pay the annual BLM fees on or before five (5) days prior to

the deadline for payment of those fees, then BENDAU may elect to pay the annual BLM claim maintenance fees in the approximate amount of $140.00 directly in order to preserve its collateral, with proof of such payment to be provided to Debtor, and Debtor shall add the amount of any fees paid directly by BENDAU to the Modified Loan Balance.  If the Debtor does not pay the Modified Loan Balance in full within ninety (90) days from the Effective Date of the Plan, then the automatic stay shall be terminated immediately and BENDAU will be entitled to enforce its legal and contractual remedies against its collateral.  In the event BENDAU elects to foreclose on its collateral for non-payment, the Debtor shall be entitled to repurchase the collateral within ninety (90) days from the date of foreclosure by payment in full of the Modified Loan Balance.

Accordingly, the Class 4 secured claim of BENDAU is impaired under the PLAN.

5. **CLASS 5 SECURED CLAIM OF [EUCON CORP & DEATLEY CRUSHING]:** The Class 5 Secured Claim of DEATLEY shall retain its existing security interest and the outstanding loan balance shall be recalculated using the outstanding loan balance plus accrued interest at the non-default rate of interest of 10% from the date of the Notice of Default, plus reasonable attorneys' fees and collection costs (no late fees are to be included)  until the Confirmation Date ("Modified Loan Balance").  DEATLEY's security interest of 6 unpatented lode mining claims on BLM is secured by a recorded First Deed of Trust.  The Class 5 secured claim of DEATLEY shall be paid as follows:

    a.   Debtor shall pay the annual BLM claim maintenance fees in the amount of $840.00 on or before five (5) days prior to the deadline for payment of those fees, with proof of such payment to be provided to DEATLEY.  Additionally, Debtor shall pay DEATLEY its Modified Loan Balance in full within ninety (90) days from the Effective Date of the Plan.  Upon receiving payment of the Modified Loan Balance, DEATLY shall release its interest in the collateral and file a reconveyance deed in favor of the Debtor in Elko County where the security interest is located.

    b.   If the Debtor is unable to pay the annual BLM fees on or before five (5) days prior to

the deadline for payment of those fees, then DEATLEY may elect to pay the annual BLM claim maintenance fees in the approximate amount of $840.00 directly in order to preserve its collateral, with proof of such payment to be provided to Debtor, and Debtor shall add the amount of any fees paid directly by DEATLEY to the Modified Loan Balance.  If the Debtor does not pay the Modified Loan Balance in full within ninety (90) days from the Effective Date of the Plan, then the automatic stay shall be terminated immediately and DEATLEY will be entitled to enforce its legal and contractual remedies against its collateral.   In the event DEATLEY elects to foreclose on its collateral for non-payment, the Debtor shall be entitled to repurchase the collateral within ninety (90) days from the date of foreclosure by payment in full of the Modified Loan balance.

Accordingly, the Class 5 secured claim of DEATLEY is impaired under the PLAN.

6.   **CLASS 6 SECURED CLAIM OF [LDP DIVERSIFIED LLC]:** The Class 6 Secured Claim of LDP shall retain its existing security interest and the outstanding loan balance shall be recalculated using the outstanding loan balance plus accrued interest at the non-default rate of interest of 14% from the date of the Notice of Default, plus reasonable attorneys' fees and collection costs (no late fees are to be included)  until the Confirmation Date ("Modified Loan Balance").  LDP's security interest is secured by a first priority deed of trust recorded against the real property consisting of water well and water appropriation rights known as water right Permit# 52895 in Elko County, Nevada.  The class 6 secured claim of DEATLEY shall be paid as follows:  The Debtor shall pay the Modified Loan Balance in full within ninety (90) days from the Effective Date of the Plan.  Upon receiving payment of the Modified Loan Balance, LDP shall release its interest in the collateral and file a reconveyance deed in favor of the Debtor in Elko County where the security interest is located.  If the Debtor does not pay the Modified Loan Balance in full within ninety (90) days from the Effective Date of the Plan, then the automatic stay shall be terminated immediately, and DEATLEY shall be entitled to enforce its legal and contractual remedies against the collateral.   In the even DEATLEY elects to foreclose on the collateral, then Debtor shall be entitled to repurchase the collateral within

ninety (90) days from the date of foreclosure by payment in full of the Modified Loan Balance. Accordingly, the Class 6 secured claim of LDP is impaired under the PLAN.

7. **CLASS 7 SECURED CLAIM OF [TERRY VANCE]**: The Class 7 secured claim of VANCE shall retain its existing security interest and the outstanding loan balance shall be recalculated using the outstanding loan balance plus accrued interest at the non-default rate of interest of 15% from the date of the Notice of Default, plus reasonable attorneys' fees and collection costs (no late fees are to be included) until the Confirmation Date ("Modified Loan Balance"). VANCE's security interest of 5 unpatented lode mining claims on BLM land is secured by a recorded First Deed of Trust. VANCE'S Class 7 allowed claim shall be paid pursuant to a STIPULATION BETWEEN DEBTOR, TERRY L. VANCE, JR. AND CRAIG BRADFORD RE: TERMINATION OF AUTOMATIC STAY ("Stipulation") entered into between the parties, as follows:

a. Debtor shall pay the annual claim maintenance fees to the BLM and Elko county in the approximate amount of $700.00 in a timely manner with proof of such payment to be provided to VANCE. Additionally, Debtor shall pay VANCE its Modified Loan Balance in full by December 2, 2013. Upon receiving payment in full of the Modified Loan Balance, VANCE shall release its interest in the collateral and file a reconveyance deed in favor of the Debtor in Elko County where the security interest is located.

b. If Debtor is unable to pay the annual BLM and Elko county fees by the due dates and provide evidence to VANCE pursuant to the parties' Stipulation, then the 11 U.S.C. §362(a) automatic stay shall be terminated immediately, and VANCE would be entitled to enforce its legal and contractual remedies against its collateral. In that event, VANCE shall pay the BLM claim maintenance fees in the amount of $700.00 in a timely manner with proof of such payment to be provided to Debtor, and Debtor shall have an option to repurchase the collateral within 120 days from the date of any foreclosure by VANCE by paying the Modified Loan Balance in full.

Accordingly, the Class 7 secured claim of VANCE is impaired under the PLAN.

8. **CLASS 8 SECURED CLAIM OF [BILL DEGAR]**: The Class 8 Secured Claim of DEGAR shall retain its existing security interest and the outstanding loan balance shall be recalculated using the outstanding loan balance plus accrued interest at the non-default rate of interest of 5% from the date of the Notice of Default, plus reasonable attorneys' fees and collection costs (no late fees are to be included) until the Confirmation Date ("Modified Loan Balance"). DEGAR's security interest of 1 unpatented lode mining claims on BLM land is secured by a recorded First Deed of Trust. The Class 8 secured claim of DEGAR shall be paid as follows:

    a. Debtor shall pay the annual BLM claim maintenance fees in the amount of $140.00 on or before five (5) days prior to the deadline for payment of those fees, with proof of such payment to be provided to DEGAR. Additionally, Debtor shall pay DEGAR its Modified Loan Balance in full within ninety (90) days from the Effective Date of the Plan. Upon receiving payment of the Modified Loan Balance, DEGAR shall release its interest in the collateral and file a reconveyance deed in favor of the Debtor in Elko County where the security interest is located.

    b. If the Debtor is unable to pay the annual BLM fees on or before five (5) days prior to the deadline for payment of those fees, then DEGAR may elect to pay the annual BLM claim maintenance fees in the approximate amount of $140.00 directly in order to preserve its collateral, with proof of such payment to be provided to Debtor, and Debtor shall add the amount of any fees paid directly by DEGAR to the Modified Loan Balance. If the Debtor does not pay the Modified Loan Balance in full within ninety (90) days from the Effective Date of the Plan, then the automatic stay shall be terminated immediately and DEGAR shall be entitled to enforce its legal and contractual remedies against its collateral. In the event DEGAR elects to foreclose on its collateral for non-payment, the Debtor shall be entitled to repurchase the collateral within ninety (90) days from the date of foreclosure by payment in full of the Modified Loan balance.

Accordingly, the Class 8 secured claim of DEGAR is impaired under the PLAN.

9. **CLASS 9 CLAIMS (GENERAL UNSECURED ALLOWED CREDITORS)**: The Class 9 General Unsecured Allowed Creditors, shall be paid 100% of their allowed claims by the Debtor, within one (1) year of the Effective Date of the Plan, with interest at the rate of 2% per annum, commencing to accrue interest from the Confirmation Date until paid, with no interim payments made during the one (1) year period. Accordingly, the Class 9 General Unsecured Claims are impaired under the Plan.

10. **CLASS 10 EQUITY INTERESTS OF DEBTOR**:  The equity interests of the shareholders of Debtor existing on the Petition Date shall remain unchanged, except for dilution of their total percentage ownership in the event an equity investor purchases the remaining outstanding shares of the Debtor.   Accordingly, the Class 10 interests of the Debtor are unimpaired under the Plan.

## X. BAR DATE FOR FILING CLAIM

The bar date for filing a proof of claim in this case is September 3, 2013, for all creditors (except a governmental unit).  The bar date for objecting to claims will be sixty (60) days after the date on which the PLAN is confirmed by the Court.  All priority unsecured and general unsecured claims which are listed as disputed in the PLAN or who believe that the amounts listed in the PLAN are incorrect, shall file proofs of claim in this case by the bar date set forth above.  Failure to file a proof of claim by a disputed claimant or a claimant who disagrees with the amount listed in the PLAN within such time period will result in the amount listed in the PLAN being established as the amount owing to such creditor, and such creditor will participate in the PLAN, based upon its claim listed in the PLAN.

## XI. MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN

1.     **Operations of Property, Advances from Guarantors and Disbursements**

The Debtor's Real Property consists of 232 unpatented lode mining claims located on BLM land in White Pine and Elko Counties at Kinsley Mountain, Nevada.  Kinsley also owns one water well and has been granted 4 Water Rights allocations under Permits: 52895, 80591, 80589 and 80590 from the State of Nevada.  The Debtor shall fund the Plan through the sale of shares of the company to an equity investor, in a sufficient amount to pay all allowed creditors'

claims in full.   The Debtor is in the process of obtaining a Letter of Intent from an equity investor and will provide evidence of the Letter of Intent to the Court under seal prior to the hearing on the Disclosure Statement.  Bruce Anderson, President of Debtor shall also contribute enough capital to pay the 2014-2015 annual maintenance claim fees to the BLM on the 232 claims.   Bruce Anderson has already contributed the funds for the water rights permit extensions.

2. **Post-Confirmation Default**

In the event the Debtor becomes delinquent in duty or obligation under the Plan, the affected creditor or creditors may provide written notice of such default to the Debtor and its counsel.  The Debtor shall thereafter have fifteen (15) business days from receipt of said notice in which to cure the default.  In the event such default remains uncured, the affected creditor or creditors shall be entitled to foreclose upon the real property (if a secured creditor) or take other appropriate action.   The Debtor shall have the right to bring the issue of default before the Bankruptcy Court.  At any hearing, the Bankruptcy Court may consider the reason for the default and the ability of the Debtor to cure the default in a reasonable period of time.   The Bankruptcy Court may also consider conversion of the case to a Chapter 7 of the Bankruptcy Code or dismissal of the same is in the best interest of creditors.

3. **Professionals' Fees**

After the Confirmation Date of the Plan, the Debtor and any other professional, such as Debtor's general bankruptcy counsel, any special purpose counsel or accountants, will not be required to apply to the Court for compensation for services rendered post-confirmation. Post-confirmation compensation of the Debtor's professionals shall be at their normal hourly rate(s) and customary cost charges.

4. **Distribution**

All cash proceeds shall be distributed in the foregoing  manner except amounts necessary to pay disputed claims against the Debtor in the event they are allowed, which shall be held as a reserve and paid as such claims are determined by agreement between the parties or as are judicially determined.

5.     **Taxes**

Unless otherwise provided in the Plan, all taxes are paid current and there are no tax liens on real or personal property owned by the Debtor.

**XII. <u>PROVISIONS GOVERNING DISTRIBUTION AND DISCHARGE</u>**

1.     <u>THE DISBURSING AGENT</u>.

KINSLEY RESOURCES, INC., in its capacity as Debtor and Debtor-in-Possession, is ultimately responsible for making all distributions pursuant to the Plan.  To assist it in discharging those responsibilities, Debtor shall select a depository institution authorized by the Court for all funds which are to be sequestered for claims of creditors and ultimately distributed to creditors holding allowed claims.

2.     <u>UNCLAIMED DISTRIBUTIONS</u>.

Any property to be distributed pursuant to the Plan, if not claimed by the distributee within one (1) year after the payment, shall be returned to the Debtor.

3.     <u>EFFECT OF CONFIRMATION</u>.

Upon confirmation and performance of the Plan, KINSLEY RESOURCES, INC.,  shall be discharged from any debt that arose before the date of Confirmation, and any debt of a kind specified in §§ 502(g), 502(h), or 502(I) of the Bankruptcy Code, to the full extent permitted by Bankruptcy Code § 1141(d).  In addition, pending execution of the Plan, and unless the Court has otherwise expressly ordered or the Plan otherwise expressly provides, all creditors and parties in interest shall be stayed from proceeding against the assets of KINSLEY RESOURCES, INC., including stay of default proceedings.

4.     <u>EXCULPATION</u>.

Neither the Unsecured Creditors' Committee, if any, nor Debtor nor any of their respective members, officers, directors, employees, representatives, professionals or agents, will have or incur any liability to any Creditor for any act or omission in connection with or arising out of the Reorganization Case, including, without limitation, prosecuting confirmation of this Plan, consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, except for gross negligence, willful misconduct or fraud.

### XIII. POST-CONFIRMATION INJUNCTION

No entity may commence or continue any action or proceeding, or perform any act to interfere with the implementation and consummation of the PLAN and the payments to be made thereunder; or (ii) assert any claim, counter-claim, cross-claim, affirmative defense, defense, set off, recoupment or any action of any kind or nature (collectively "Potential Actions") against Debtor, their members, managers, employees, directors, attorneys, agents, representatives, or any successors or assigns of any or all of the foregoing Persons.

Confirmation of the PLAN shall constitute a permanent injunction against and irrevocable release of any and all Potential Actions.

### XIV. EXECUTORY CONTRACTS

<u>Reservation of Rights</u>.  The Debtor reserve the right to assume or reject, pursuant to §365 of the Code, any executory contract or unexpired lease not assumed or rejected prior to the Confirmation Date.  All executory contracts and unexpired leases not specifically assumed or rejected as of the Confirmation Date or as to which application to reject shall not be pending on the Confirmation Date shall be deemed rejected by the Debtor.   At this time, the Debtor has no leases, contractual or executory contracts with either the BLM or with third parties.  A locatable mineral claim on BLM land, which includes all of Kinsley's BLM claims, is not legally considered a lease or contractual or executory contracts under the rules/laws of the BLM.  Kinsley water allocations are issued under permits and are considered real property, but are not legally considered leases, contractual or executory contracts.   However, out of an abundance of caution, the Debtor hereby assumes any and all of its water right allocations as indicated on its Schedule A [Docket No. 39], and assumes all of the following rights to mining claims:

| NAME OF CREDITOR | DESCRIPTION |
|---|---|
| Bureau of Land Management<br>Nevada State Office<br>1340 Financial Blvd.<br>Reno, NV  89502 | 296 unpatented lode mining claims with annual filing and maintenance fees due to retain claims. |
| Elko County Recorder<br>571 Idaho Street, Room 103<br>Elko, NV  89801 | Recording fees and annual intent to hold fees due for 296 unpatented lode mining claims. |

| Falcon Geodetic, Ltd.<br>c/o Zach Henderson<br>321 Cherry Ave.<br>Auburn, CA 95603 | Contract to finalize corner staking on 296 unpatented lode mining claims for a fee of $49,676. |
|---|---|
| White Pine Recorder<br>801 Clark Street, Suite 1<br>Ely, NV 89301 | Annual intent to hold fees due on unpatented lode mining claims. |

## XV. MISCELLANEOUS PROVISIONS

Notice.  Any notice described in or required by the terms of this PLAN or the Code and Rules shall be deemed to have been properly given when actually received or if mailed, five days after the date of mailing, if such shall have been sent by certified mail, return receipt requested, and if sent to:

The Debtor, addressed to:
STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE LLC
6151 Lakeside Drive, Suite 2100
Reno, NV 89511

Headings.  the headings used herein are inserted for convenience only and neither constitute a portion of the PLAN nor in any manner affect the construction of the provisions of the PLAN.

Severability.  Should any provision of this Plan be determined to be unenforceable following the Effective date, such determination shall in no way limit or affect the enforceability of any and all other provisions of this Plan.

Governing Law.  Except to the extent that the Code or other applicable federal law is applicable, the rights, duties and obligations arising under this Plan shall be governed by and construed in accordance with the laws of the State of Nevada.

Successors and Assigns.  The rights, duties and obligations of any Person named or referred to in this Plan shall be binding upon and shall inure to the benefit of the successors and assigns of such person.

Designation of Managers.  Those individuals who were acting as Officers of the Debtor as of the Petition Date, shall continue to serve in the capacity to which they were appointed. Specifically, BRUCE ANDERSON shall continue to serve without compensation for his labor

as the President and authorized representative of the Debtor.

## XVI. PROCEDURES FOR RESOLVING CONTESTED CLAIMS

Claims Objections.  Objections to Claims shall be filed with the Court and served upon each holder of a Claim to which objection is made no later than sixty (60) days after the Confirmation Date.

Payment Procedures.  Payments to the holder of a Claim to which objection has been made that ultimately becomes an Allowed Claim shall be made in accordance with the provision of the PLAN with respect to the Class of Creditors to which the holder of such an Allowed Claim belongs.  However, interest, if any, on any funds reserved for a contested claim shall inure to the benefit of the holder of such an Allowed Claim.

Avoidance Actions.  To the extent appropriate, the Debtor shall have the right to bring any and all avoidance actions, the same to be commenced with 90 days of the Confirmation date.  Proceeds of all avoidance actions shall vest in the Debtor pursuant to 11 U.S.C. §1141.

## XVII. CONFIRMATION REQUEST

The Debtor request that the PLAN be confirmed in accordance with the provisions of §1129(a) and/or §1129(b) of the Code.

## XVIII. RETENTION OF JURISDICTION

Notwithstanding confirmation of this PLAN, the Court will retain jurisdiction for the following purposes, and each of them:

1.    The Court will retain jurisdiction to determine the allowability and payment of any claim(s) upon any objection(s) thereto (or other appropriate proceedings) by the Debtor or by any other party in interest entitled to proceed in that manner.  As part of such retained jurisdiction, the Court will continue to determine the allowability of Administrative Claims and any request(s) for payment(s) thereof, including professional fees and costs which are Administrative Claims.

2.    The Court will retain jurisdiction to determine any dispute(s) which may arise regarding the interpretation of any provision(s) of this PLAN.

3.    The Court will retain jurisdiction to facilitate the consummation of this PLAN by

1    entering, consistent with the provisions of this PLAN, any further necessary or appropriate

2    order(s) regarding the enforcement of this PLAN and any provision(s) thereof.

3        4.    The Court will retain jurisdiction to adjudicate any cause(s) of action or other

4    proceeding(s) presently pending or otherwise referenced here or elsewhere in this PLAN,

5    including, but not limited to, the adjudication of any and all "core proceedings" under 28 U.S.C.

6    § 157(b), which may be pertinent to this Reorganization Case, and which the Debtor may deem

7    it appropriate to initiate and prosecute in aid of its reorganization.

8        5.    The Court will retain jurisdiction to enter an appropriate final decree in this

9    Reorganization Case.

10        6.    The Court will retain jurisdiction to enter an appropriate final decree, and any

11    interim order(s), in any adversary proceedings which may be initiated during this Chapter 11

12    proceeding.

13    ### XIX. FEASIBILITY OF DEBTOR'S PLAN

14        Debtor believes that the PLAN is feasible based upon the payment of the BLM annual

15    maintenance fees from funds contributed by Bruce Anderson, and the infusion of equity capital

16    in an estimated amount $13,500,000 which is large enough to pay all allowed creditors' claims

17    in full.  Debtor projects it will have the annual BLM maintenance fees paid by August 27, 2013,

18    and that the infusion of the equity capital to pay all creditors will occur within ninety (90) days

19    from the Effective Date of the Plan.

20    ### XX. LIQUIDATION ANALYSIS

21        Debtor is proposing an operating PLAN where its assets will continue to be operated by

22    the Debtor.

23        The PLAN must provide that a nonconsenting impaired claimant or interest holder of a

24    consenting class receive at least as much as would be available had the debtor filed a Chapter 7

25    petition instead.

26        In a Chapter 7 case, the general rule is that the debtor's assets are sold by a trustee.

27    Unsecured creditors share in the proceeds of sale only after secured creditors and administrative

28    claimants are paid.  Certain unsecured creditors get paid before other unsecured creditors do.

1   Unsecured creditors with the same priority share in proportion to the amount of their allowed

2   claim in relationship to the total amount of allowed claims.

3       A creditor would recover from the assets of the bankruptcy estate less under Chapter 7

4   than under Chapter 11 for two reasons.  First, the estimated market value of the Debtor'

5   encumbered assets under an "as is" liquidation scenario, estimated at $17,172,820.00 is subject

6   to the following conditions:  This amount may be depleted by several events and timelines,

7   including the carve-out for the secured liabilities of approximately $6,200,000, and the probable

8   fact that the number of mineral claims that will be retained will diminish should there be a

9   failure to pay annual BLM and county fees – possibly to the point of none remaining.  At that

10  point, the only remaining live assets would be the water well and water rights, some of which

11  are themselves subject to encumbrance.  Further, even if the property rights are continued for

12  the forthcoming year by payment of the BLM and county fees, after deducting costs incurred in

13  having to maintain the encumbered real property and to market and sell such property, along

14  with the time for such process, any equity that exists, if any, in the property would be

15  significantly reduced.   Additionally, the unencumbered assets are minimal and virtually

16  unsaleable in the current market.  Second, in a Chapter 7 case a trustee is appointed and is

17  entitled to compensation from the bankruptcy estate in an amount no more than 25% of the first

18  $5,000 of all money disbursed, 10% on any amount over $5,000 but less than $1,000,000, 5%

19  on all amounts over $1,000,000 but less than $3,000,000, and reasonable compensation not to

20  exceed 3% on any amount over $3,000,000, thus diminishing monies available for payment to

21  unsecured creditors.

22      Assuming the Debtor had to liquidate its assets as indicated above and pay off those

23  claims being asserted by the secured creditors, it is unlikely the Debtor would be left with any

24  amounts for payment to General Unsecured Creditors and distribution to Debtor's equity

25  holders.  Thus, if there were a liquidation of assets, Debtor believes that general unsecured

26  creditors would not receive more on their claims than is being proposed in Debtor's Plan, due to

27  the nature and amount of the secured claims against the Debtor's assets and the nature and value

28  of such assets.  Additionally, even if there were sufficient amounts to pay general unsecured

creditors in full on liquidation, which is highly doubtful, Debtor's Plan proposes payment in full with interest thereon so general unsecured claims would not receive more from a liquidation.

    Respectfully submitted this 22nd day of August, 2013.

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE LLC

*/s/ Stephen R. Harris*

_____

Attorneys for Debtor

1

2

## VERIFICATION

3    I, BRUCE C. ANDERSON, President of KINSLEY RESOURCES, INC., Debtor,

4    declare under penalty of perjury that I have read the foregoing DEBTOR'S DISCLOSURE

5    STATEMENT, and that the contents contained therein are true and correct to the best of my

6    knowledge, information and belief.

7        DATED this 22nd day of August, 2013.

8

9    _Bruce C. Anderson_

10   BRUCE C. ANDERSON, PRESIDENT OF
     KINSLEY RESOURCES, INC., Debtor

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28